IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: NOBLE SUPPLY & LOGISTICS, LLC, *et al.*,<br><br>Debtors. | : | Chapter 11<br>Bankr. No. 26-11369 (CTG)<br>(Jointly Administered) |
| DEFENSE LOGISTICS AGENCY,<br><br>Appellant,<br>v. | : | Adv. No. 26-50885 (CTG)<br><br>Civ. No. 26-1433-JLH |
| NOBLE SUPPLY & LOGISTICS, LLC,<br><br>Appellee. | : | |

**MEMORANDUM OPINION**

## I. INTRODUCTION

Pending before the Court is the emergency motion (D.I. 3) (the "Emergency Motion") filed by appellant, United States of America (the "Government"), on behalf of Defense Logistics Agency ("DLA"), seeking a stay pending appeal of the Bankruptcy Court's November 6, 2026 *Order (I) Granting in Part and Denying in Part Motion of Noble Supply & Logistics, LLC for Partial Summary Judgment, (II) Granting in Part and Denying in Part the United States' Motion to Dismiss, and (III) Denying the United States' Cross-Motion for Summary Judgment* (Adv. D.I. 50)[1] (the "Turnover Order"), issued in the above-referenced adversary proceeding. Chapter 11 debtor Noble Supply & Logistics, LLC ("Noble," and together with certain affiliates, the "Debtors") filed a complaint seeking

[1] Citations to "Adv. D.I." are to the docket of the adversary proceeding, *Noble Supply & Logistics, LLC, v. Defense Logistics Agency*, Adv. Proc. No. 26-50885 (CTG) (Bankr. D. Del.), and citations to "Bankr. D.I." are to the docket of the main bankruptcy case, *In re Noble Supply & Logistics, LLC, et al.*, No. 26-11369 (CTG) (Bankr. D. Del.).

turnover, under 11 U.S.C. § 542(b),[2] of approximately $14.6 million for goods and services it allegedly delivered to DLA prior to the termination of the parties' contracts, or, in the alternative, breach of contract damages.

The Turnover Order is supported by the Bankruptcy Court's accompanying Amended Memorandum Opinion (Adv. D.I. 55) ( "Opinion"), which examined the approximately 108 deliveries at issue, and held that DLA owed Noble matured payment obligations for goods and services totaling $8,493,160.09[3] (the "Orders at Issue"), concluding that the Government's objections to those obligations did not identify a genuine dispute concerning Noble's performance. The Opinion further concluded that the remaining $6,073,107.93 of deliveries at issue involved unresolved contractual disputes that were not properly recoverable through a turnover action. The Turnover Order directed DLA to remit payment to Noble in the amount of $8,458,217.45 by November 9, 2026.

The Government has appealed the Turnover Order, asserting that Noble's section 542 turnover claim was "substantively a disguised breach of contract claim," and that the Tucker Act, 28 U.S.C. § 1491, vests exclusive jurisdiction for such contract claims against the United States with the United States Court of Federal Claims. On November 6, 2026, this Court issued an order (1) granting a temporary administrative stay of the Turnover Order through November 16, 2026 (the "Temporary Stay"), and (2) ordering expedited briefing on the Emergency Motion. (D.I. 5.)

The parties finished briefing the Emergency Motion yesterday, and both sides want the Court to provide an expedited ruling. (D.I. 3, 8, 9, 10.) For the reasons set forth below, the Emergency

---

[2] Section 106(a) of the Bankruptcy Code abrogates sovereign immunity as to a governmental unit with respect to claims asserted under section 542 of the Bankruptcy Code. *See* 11 U.S.C. § 106(a)(1).

[3] The Opinion found $8,493,160.09 in matured debts. (Op. at 3 n.8, 35.) The Turnover Order directs payment of the reduced amount of $8,458,217.45, which accounts for certain "fastpay" deliveries DLA has already paid. (Turnover Order ¶ 5; Op. Ex. B at 1, 3 n.4.)

Motion will be denied, but the Temporary Stay will be extended for an additional seven (7) days, through and including November 23, 2026, to permit the Government to seek further relief.

Because the parties seek a decision from this Court on a highly expedited basis, I primarily write for the parties, and I provide only enough detail so that the parties can understand my reasoning.

## II. BACKGROUND

### A. Overview of Noble and its Contracts with DLA

Noble and DLA are parties to multiple contracts, under which Noble supplied the United States military with safety equipment, training services, tactical gear, and other goods and services. (NA3.)[4] It is undisputed that the contracts relevant to this appeal (the "Contracts") incorporate in full the terms and conditions for commercial products and services under Part 12 of the Federal Acquisition Regulations (the "FAR"), codified in 48 C.F.R. § 52.212-4. (*See* D.I. 3 at 7 n.7 (citing NA17–21, 79–83); D.I. 8 at 4.) Under those terms, "[p]ayment shall be made for items accepted by the Government that have been delivered to the delivery destinations set forth in the contract." (NA18, 80.) The Contracts contain the following acceptance provision:

> (a) *Inspection/Acceptance*. The Contractor shall only tender for acceptance those items that conform to the requirements of this contract. The Government reserves the right to inspect or test any supplies or services that have been tendered for acceptance. The Government may require repair or replacement of nonconforming supplies or reperformance of nonconforming services at no increase in contract price. If repair/replacement or reperformance will not correct the defects or is not possible, the Government may seek an equitable price reduction or adequate consideration for acceptance of nonconforming supplies or services. The Government must exercise its postacceptance rights (1) within a reasonable time after the defect was discovered or should have been discovered; and (2) before any substantial change occurs in the condition of the item, unless the change is due to the defect in the item.

(NA17, 79.)

---

[4] The appendix (D.I. 8-1) filed in support of Noble's objection to the Emergency Motion is cited herein as "NA__."

The record is uncontroverted that, prior to the instant dispute, DLA typically validated Noble's proof of delivery or provision of services, or raised specific issues precluding validation, within five business days. (NA4 ¶ 13.) Absent any specifically identified issues with Noble's delivery of goods or provision of services, the total elapsed time between delivery of product or provision of services and acceptance was approximately seven days. (*Id.*)

On August 27, 2026 (the "Termination Date"), DLA issued four notices purporting to terminate approximately $400 million in orders under the Contracts (the "Termination Notices"). (NA192–207.) By their express terms, the Termination Notices had no impact on payment for goods or services delivered or provided through the Termination Date. (NA194, 198, 202, 206.)

### B. The Chapter 11 Cases and the Adversary Proceeding

Following negotiations with its various lenders, the Debtors filed for chapter 11 on August 30, 2026, with a plan to sell their business assets. (*Id.* ¶¶ 58–64.) The Bankruptcy Court has granted three interim orders authorizing the Debtors to use the prepetition lenders' cash collateral in order to finance the bankruptcy case. (Bankr. D.I. 73, 218, 338.) The Bankruptcy Court has also entered an order authorizing the Debtors to undertake a sale process, which contemplates a sale in late November. (Bankr. D.I. 219.)

On October 6, 2026, Noble filed a complaint initiating the adversary proceeding against DLA[5] seeking to recover funds allegedly due under the Contracts. The complaint alleged that DLA refused to permit Noble to invoice approximately $14.5 million for goods and services provided to the

[5] The Government notes in passing "Noble's failure to sue the correct government entity, as Congress has not authorized DLA to be sued in its own name," but does not otherwise address this issue in the Emergency Motion or Reply. (*See* D.I. 3 at 9.) It appears undisputed that the Bankruptcy Court had subject matter jurisdiction to order turnover against the Government. The parties' disagreement on appeal hinges on whether Count I of the complaint constitutes a proper claim for turnover or a "disguised" breach of contract claim. In light of the fact that the Government has not challenged this Court's jurisdiction to hear the appeal, and there is otherwise subject matter jurisdiction over claims asserted under section 542 of the Bankruptcy Code, the Court will construe this as a turnover action against the United States.

Government on or before the Termination Date (the "Pre-Termination Delivery Orders"). The complaint asserted two claims: for turnover (Count I) under section 542(b) of the Bankruptcy Code, and, alternatively, breach of contract (Count II). That same day, the Debtors moved for summary judgment and to shorten time to have the summary judgment motion heard no later than October 30, 2026. (Adv. D.I. 3, 6.) The motion to shorten alleged that DLA was withholding payment on more than $14.5 million in goods that had been delivered and that would have typically been paid in the ordinary course. (Adv. D.I. 6 at 2.) The motion further represented that without receipt of the funds alleged to be due, the "Debtors will likely exhaust their liquidity during the first week of November 2026." (*Id*. at 7.) The Bankruptcy Court entered an order shortening time and providing that the motion for summary judgment would be heard on October 28, 2026. (Adv. D.I. 15.)

In support of summary judgment, Noble submitted the declaration of Robert Albergotti, Noble's Chief Transformation Officer (Adv. D.I. 5), which stated, in part:

> Noble delivered certain goods to the contractually agreed-upon destinations or provided services to the appropriate party through the date of the DLA's purported termination on August 27, 2026, and the Government retained possession of such goods (the "Pre-Termination Delivery Orders"). ... The Government has not raised any defects or nonconformities with respect to the goods and services associated with the Pre-Termination Delivery Orders as of [October 6, 2026].

(NA6 ¶ 17.) The Government opposed and cross-moved for summary judgment, and moved to dismiss the complaint. (Adv. D.I. 17, 19, 23.) The Bankruptcy Court held a hearing on the parties' motions on October 28, 2026. (Adv. D.I. 15, 28.) At the hearing, the Bankruptcy Court indicated that it was inclined to, *inter alia*, consider the claim for turnover to the extent the Debtors could establish the absence of any dispute of material fact with respect to a matured debt due from the Government, and dismiss the remaining claim for breach of contract on sovereign immunity grounds. The Bankruptcy Court then proceeded to consider the merits of the summary judgment record. The Bankruptcy Court identified the core of the dispute between the parties as various positions taken

regarding 108 deliveries allegedly made by the Debtors for which the Government had allegedly withheld payment. At the conclusion of that hearing, however, the Bankruptcy Court determined that it required supplemental briefing to sort through the 108 deliveries to determine whether, in light of the disputes raised by the Government, the Debtors were entitled to turnover. The Bankruptcy Court directed the parties to provide those supplemental briefs by Friday, October 30, 2026, with a view towards having the Bankruptcy Court issue a ruling on Monday, November 2, 2026. Both parties filed those supplemental letter briefs. (Adv D.I. 41, 42.)

### C. The Opinion and the Appeal

On November 2, 2026, the Bankruptcy Court issued a thorough, 48-page opinion, having painstakingly reviewed the various invoices at issue in the very short interim.[6] The Opinion granted summary judgment in favor of Noble on Count I of the complaint, concluding that matured payment obligations totaling $8,493,160.09 were subject to turnover under section 542(b) of the Bankruptcy Code, as the Government's objections to those obligations did not identify a genuine dispute concerning Noble's performance. (Op. at 35.) The Opinion further concluded that the remaining $6,073,107.93 of deliveries at issue involved unresolved contractual disputes, including whether certain goods were delivered to the agreed-upon destination, and dismissed those claims for lack of jurisdiction. (Op. at 41.) The Bankruptcy Court dismissed Count II (breach of contract) without prejudice on jurisdictional and sovereign immunity grounds. (*Id.* at 31 & n.81.) The Bankruptcy Court entered the Turnover Order consistent with the Opinion on November 6, 2026. That same day, the Government appealed the Order and filed the instant Emergency Motion. (D.I. 1, 3.)

## III. JURISDICTION AND APPLICABLE STANDARD

Appeals from the Bankruptcy Court to this Court are governed by 28 U.S.C. § 158. District

---

[6] On November 9, 2026, the Bankruptcy Court issued its Amended Memorandum Opinion to correct certain typographical errors and otherwise clarify the Memorandum Opinion issued on November 2, 2026. (Adv. D.I. 55.) All references herein are to the Amended Memorandum Opinion.

courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees." 28 U.S.C. § 158(a)(1). The Turnover Order, which fully resolved all claims in the adversary proceeding, is final and appealable. *In re Odyssey Contracting Corp.*, 944 F.3d 483, 486 (3d Cir. 2019) ("[A] bankruptcy court order ending a separate adversary proceeding is appealable as a final order even though that order does not conclude the entire bankruptcy case.") (quoting *In re Prof'l Ins. Mgmt.*, 285 F.3d 268, 281 (3d Cir. 2002)).

"The granting of a motion for stay pending appeal is discretionary with the court." *In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *2–3 (Bankr. D. Del. Mar. 27, 2001). The Government bears the burden of proving that a stay of the Turnover Order is warranted based on the following criteria: (1) whether the movant has made "a strong showing" that it is likely to succeed on the merits; (2) whether the movant will be irreparably injured absent a stay; (3) whether a stay will substantially injure other interested parties; and (4) where the public interest lies. *Republic of Philippines v. Westinghouse Electric Corp.*, 949 F.2d 653, 658 (3d Cir. 1991). The "most critical" factors, according to the Supreme Court, are the first two: whether the stay movant has demonstrated (1) a strong showing of the likelihood of success, and (2) that it will suffer irreparable harm—the latter referring to harm that cannot be prevented or fully rectified by a successful appeal. *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). According to the Third Circuit, this Court's analysis should proceed as follows:

> Did the applicant make a sufficient showing that (a) it can win on the merits (significantly better than negligible but not greater than 50%) *and* (b) [it] will suffer irreparable harm absent a stay? If it has, [the court should] balance the relative harms considering all four factors using a sliding scale approach. However, if the movant does not make the requisite showings on either of these first two factors, the inquiry into the balance of harms and the public interest is unnecessary, and the stay should be denied without further analysis.

*In re Revel AC*, 802 F.3d at 571 (emphasis in original) (internal quotations and citations omitted).

## IV. DISCUSSION

### A. Likelihood of Success on the Merits

To show that a stay of the Turnover Order is warranted here, the Government must first demonstrate that it has "a reasonable chance, or probability, of winning." *In re Revel AC*, 802 F.3d at 568. The likelihood of winning on appeal need not be more likely than not. *Id*. at 569.

The Government argues that the Bankruptcy Court exceeded its jurisdiction by adjudicating contract disputes that were substantively disguised as a turnover action. The Government further argues that it has no obligation to pay for the Orders at Issue because it has not formally "accepted" those items.

With respect to the first argument, the Government contends that the Bankruptcy Court improperly adjudicated contract disputes by analyzing "whether Noble is entitled to payment for the goods and services at issue under the [] Contracts." (Emergency Mot. ¶ 22.) However, I agree with the Debtors that the Government's argument conflates *adjudication* of a contract dispute with the threshold determination of whether a *bona fide* dispute *exists in the first place*. While the former exceeds the bounds of turnover, the Debtors argue, the Bankruptcy Court can and *must* decide the latter in determining whether a debt is subject to turnover. (D.I. 8 at 11.)

Section 542 provides that "an entity that owes a debt that is property of the estate and that is matured . . . shall pay such debt to … the trustee[.]" 11 U.S.C. § 542(b). The purpose of turnover is to "augment[] the estate … by bringing possession of the property, or its value, back to the estate." *In re Mickens*, 575 B.R. 797, 809 (Bankr. W.D. Mich. 2017); *see also In re E & G Waterworks, LLC*, 571 B.R. 500, 509 (Bankr. D. Mass. 2017) ("A turnover demand is a simple, efficient mechanism to collect matured debts currently due to the bankruptcy estate[.]"). "[T]urnover is available where all acts necessary to create the debt have occurred, such as delivery of goods or performance of services, even if the defendant disputes that anything is ultimately owed." *In re Polished.com Inc.*, 2026 WL

2547238, at *5 (Bankr. D. Del. Aug. 27, 2026) (internal quotations omitted); *see also In re Kids World of Am., Inc.*, 349 B.R. 152, 164 (Bankr. W.D. Ky. 2006) ("There is no future event or act that it needed to make this money due and owing; the Plaintiff has provided its consideration. This case, therefore, presents a valid claim for turnover as contemplated under 11 U.S.C. § 542.").

While turnover cannot be used to collect a legitimately disputed debt, a contract counterparty may not defeat a turnover claim merely by *alleging* the existence of a dispute (if that were the case, every turnover claim would fail). *See In re Home Easy, Ltd.*, 672 B.R. 595, 627–28 (Bankr. D.N.J. 2025). The Third Circuit has held that a *bona fide* dispute exists "[i]f there is a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts." *In re IPC Int'l Corp.*, 2014 WL 5544692, at *3 (Bankr. D. Del. Nov. 3, 2014) (quoting *B.D.W. Assocs., Inc. v. Busy Beaver Bldg. Centers, Inc.,* 865 F.2d 65, 66 (3d Cir. 1989) (internal citations omitted)). Under this standard, the bankruptcy court must determine whether there is an objective basis for a dispute as to the validity of the debt. *Id.*

The Government has not made a strong showing that it is likely to prevail on its argument that the Bankruptcy Court exceeded its jurisdiction in deciding whether a *bona fide* dispute existed as to the Orders at Issue. Bankruptcy courts may examine a debtor's contractual right to payment in deciding a turnover claim. *See*, *e.g.*, *In re Platinum Partners Value Arbitrage Fund L.P.*, 2026 WL 2198783, at *24 (S.D.N.Y. July 30, 2026) (analyzing contractual terms in resolving ownership dispute involving securities as part of turnover); *In re Pali Holdings, Inc.*, 488 B.R. 841, 846–47 (Bankr. S.D.N.Y. 2013) (granting summary judgment in favor of trustee in action for turnover of promissory note proceeds where defendant's contention that note was non-recourse was contrary to contract language). Here, the Bankruptcy Court accurately observed that the Government had failed to

identify a *bona fide* dispute with respect to the Orders at Issue and thus ordered turnover of $8.5 million in payment for those orders.[7]

The Government suggests that there is a *bona fide* dispute because it has no obligation to pay for goods that it has never formally "accepted." And the Government says that the Bankruptcy Court erred when it essentially concluded that the Government should be deemed to have "accepted" the Orders at Issue.

I disagree that the Government's failure to formally "accept" the goods gives rise to a *bona fide* dispute over its obligation to pay. The Bankruptcy Court determined that there was no factual dispute that: (i) the goods or services were delivered on or before the Termination Date; and (ii) DLA retained the goods or received the services without identifying a defect or rejecting performance. (Op. at 32, 37.) The Government's Emergency Motion does not contest those findings. Not only that, the Government has never suggested to this Court—nor did it tell the Bankruptcy Court—that there is any issue with quality or delivery of the Orders at Issue.

Rather, the Government's argument appears to be that it can indefinitely avoid a contractual obligation to pay for conforming goods delivered under a government contract by simply refusing to formally "accept" the goods. I reject that argument. Again, the Government's only proffered reason for not paying for the goods is that it has not formally "accepted" them. While the Government is correct that 48 C.F.R. § 52.212-4 provides it the right to refuse acceptance of nonconforming items, the Government has never suggested that the goods were nonconforming. *Cf. John C. Kohler Co. v. United States*, 498 F.2d 1360, 1367 n.8 (Ct. Cl. 1974) (example of the government impliedly accepting conforming goods). There is also nothing in the record before the Court to suggest that the

[7] Conversely, the Bankruptcy Court determined that the Government had identified *bona fide* disputes for the remaining $6 million in orders Noble delivered and directed the parties to resolve those disputes in the Court of Federal Claims (which, as the Bankruptcy Court determined, has jurisdiction over those contractual disputes).

Government's termination of the Contracts for cause had to do with the quality of the goods already delivered. Rather the record suggests that the issue was timeliness of deliveries and ability to perform in the future (*see* NA193, 197–98, 201–02, 205–06) and third-party communications suggesting that Noble may wind down its business (*see* NA193–94). Indeed, the Termination Notices acknowledge that the Government would remit payment for recent deliveries that had already been accepted and invoiced. (*See id.*) Under these circumstances, the Government has not made a strong showing that it is likely to prevail on its argument that there is a *bona fide* dispute that the funds are owed—the Government simply has not identified one.

In sum, the Emergency Motion provides no support for the Government's apparent contention that it will never have an obligation to pay unless and until it executes an "acceptance" form validating delivery. Under the circumstances of this case, where it is undisputed that Government has identified no actual or potential issue with the Debtors' performance with respect to the Orders at Issue, where the Government has previously consistently accepted and paid within seven days, and where the Government apparently only refuses to accept and pay now that the Debtors are in bankruptcy (and may not have funds to pay other alleged government debts),[8] the Court agrees that the Government has failed to establish any *bona fide* dispute as to the Debtors' right to payment for the Orders at Issue. Had the Government provided even a suggestion of a *bona fide* dispute, the Court might have reached a different conclusion.

**B. Irreparable Harm Absent a Stay**

To demonstrate this factor, the movant must show that the injury alleged is "more apt to occur than not." *In re Revel*, 802 F.3d at 569. Additionally, the injury cannot be speculative, but "must be

[8] The Court observes that DLA sought adequate protection of purported setoff rights with respect to alleged claims against the Debtors under the False Claims Act, which claims remain pending in separate litigation. "The Government's request for adequate protection [wa]s unsuccessful for several independent reasons" (Op. at 11), including because any such claims against the Debtors remain disputed and unliquidated. (*See id.* at 11-15.)

certain, great, and actual." *Hertz Corp. v. ANC Rental Corp. (In re ANC Rental Corp.)*, 2002 WL 1058196, at *2 (D. Del. May 22, 2002). The Government contends that it will be irreparably harmed absent a stay because Noble is a liquidating debtor, and it will have little to no chance of recovering its $8.5 million payment in the event the Order is reversed on appeal. (Emergency Motion ¶¶ 5, 33.) The Government concedes that the mere payment of money is not usually considered irreparable but cites *Philip Morris USA Inc. v. Scott* for the proposition that monetary losses may be irreparable if they cannot be recouped. (*Id.* at ¶ 32.) *Philip Morris* merely recognized that monetary loss could constitute irreparable harm, not that it does in all cases where there is a chance the money may not be recoverable. *See Philip Morris*, 561 U.S. 1301, 1304 (2010). That case also did not concern a bankrupt debtor or even an operating business but a fund established to promote anti-smoking programs.

Noble's bankruptcy, standing alone, does not establish irreparable harm. *See In re Sabine Oil & Gas Corp.*, 551 B.R. 132, 145 (Bankr. S.D.N.Y. 2016) ("[T]he insolvency of a debtor counterparty standing alone does not support a claim of irreparable injury sufficient to satisfy the standard for a stay pending appeal. … [I]f it were otherwise, irreparable injury would lurk in every bankruptcy, threatening to stall or derail the proceeding by stay or injunction whenever a creditor was at risk of recovering less than 100 cents on the dollar.") (internal quotation marks omitted).

The Government's argument that failure to impose a stay would render its appeal moot because it may not be paid in full fares no better. (Emergency Motion ¶ 33.) The Third Circuit has made clear that a claim for damages is moot only where "there will never be any possibility" of *any* recovery. *Nat'l Iranian Oil Co. v. Mapco Int'l, Inc.*, 983 F.2d 485, 489 (3d Cir. 1992).

Because the Government has failed to establish the two "most critical" factors in the stay analysis—that it has a reasonable likelihood of success on the merits or that it would suffer irreparable harm in absence of a stay—the Court need not consider the remaining factors. *In re Revel AC,* 802

F.3d at 571 ("if the movant does not make the requisite showings on either of these first two factors, the inquiry into the balance of harms and the public interest is unnecessary, and the stay should be denied without further analysis.") (cleaned up).

## V. CONCLUSION

Based on the foregoing, a stay of the Turnover Order is not warranted. An appropriate order follows.

Dated: November 13, 2026

The Honorable Jennifer L. Hall
United States District Judge